**Appendix--Vote Explanation**

**Relating to composition of congressional districts**

*(Passage of Engrossed Senate Bill No. 1008)*

VOTE EXPLANATION OF

HONORABLE

JOHN R. UNGER II

*Friday, August 5, 2011*

I voted against Senate Bill No. 1008 (hereinafter "SB 1008") because it fails to comply with the established legal principles governing congressional redistricting and apportionment as derived from the United States and the West Virginia State constitutions. Since 1962, in the seminal case of *Baker v. Carr*, the federal courts have had jurisdiction to consider constitutional challenges to redistricting plans (369 U. S. 186 (1962)). Subsequent federal cases interpreting the United States Constitution established the "one person, one vote" standard. (See e.g. *Gray v. Sanders*, 372 U. S. 368 (1963)). Accordingly, congressional districts must be redrawn so that "as nearly as is practicable one man's vote in a congressional election is . . . worth as much as another's". (See e.g. *Wesberry v. Sanders*, 376 U. S. 1 (1964)). The West Virginia Constitution further requires that congressional districts shall be formed of contiguous counties and be compact. (See W. Va. Const. Article I, Section 4). SB 1008 ignores the "one person, one vote" standard, provides no legislative findings for its deviation from strict equality and its districts are not compact districts. Therefore, I voted against SB 1008 because it is unconstitutional and for



EXHIBIT A

reasons including, but not limited to, the following:

(1) Nearly 150 years ago, western Virginia felt that they were underrepresented in the political system of the State of Virginia. Although slaves could not vote, they were counted as three fifths of a person for purposes of apportioning representation. It resulted in slave regions having greater representation than nonslave regions. Since most of the people in western Virginia were opposed to slavery, this region was underrepresented and disenfranchised in governmental affairs. It was this lack of representation and the anti-slavery passion that triggered western Virginia to secede from Virginia. On June 20, 1863, West Virginia would officially become a state.

(2) According to the 2010 Census, West Virginia has a total population of 1,852,994. In accordance with Article I, Section 2 and the Fourteenth Amendment of the United States Constitution, West Virginia's congressional delegation to be elected in 2012 will consist of three members. Ideally, two congressional districts would encompass 617,665 persons and one congressional district population would encompass 617,664 persons.

(3) The Senate created a Task Force on Redistricting which I chaired. Public hearings were held at 12 locations throughout the state where interested individuals spoke.

(4) The redistricting process continued during the first extraordinary session of the Legislature in August, 2011, during which the Senate appointed a Select Committee on Redistricting to develop a new congressional plan. On Wednesday August 3, 2011, the committee moved to originate a congressional redistricting bill that complied with Article I, Section 2 and the Fourteenth Amendment of the United States Constitution and Article I, Section 4 of the West Virginia Constitution. At the committee meetings, members heard explanations of applicable law together with written comments by Kenneth C. Martis,

Professor of Geography, West Virginia University, respecting the current noncompact configuration of the West Virginia Second Congressional District. Albeit the West Virginia Constitution does not define compactness, it imposes upon the Legislature the obligation to consider it as a principal factor in apportioning congressional districts.

(5) Before amendments, the originating bill amended and reenacted West Virginia Code §1-2-3 and provided for three congressional districts of equal population, comprising contiguous counties and compact districts. The First Congressional District had a population of 617,665, the Second Congressional District had a population of 617,665 and the Third Congressional District 617,664. Thus, between the district with the highest population and the district with the lowest population there was a maximum population deviation of one person. This calculates to a deviation of 0.0% (Relative Overall Range) from the ideal district population.

(6) On August 4, 2011, the committee had debate on the merits of four separate amendments to the originating congressional plan. All proposed amendments to the originating plan had substantial deviation from the ideal district population and were generally less compact.

(7) The first amendment (Senator Prezioso Congressional #1) provided for three congressional districts of unequal population and comparatively less compact districts. Under the plan, the First Congressional District had a population of 614,672, the Second Congressional District had a population of 622,181 and the Third Congressional District 616,141. Thus, between the district with the highest population and the district with the lowest population there was a maximum population deviation of 7,509 persons (Absolute Overall Range). This calculates to a deviation of 1.22% (Relative Overall Range) from the

ideal district population. The amendment was not adopted.

(8) The second amendment (Senator Prezioso Congressional #2) provided for three congressional districts of unequal population and comparatively less compact districts. Under this plan, the First Congressional District had a population of 617,980, the Second Congressional District had a population of 618,873 and the Third Congressional District 616,141. Thus, between the district with the highest population and the district with the lowest population there was a maximum population deviation of 2,732 persons (Absolute Overall Range). This calculates to a deviation of 0.44% (Relative Overall Range) from the ideal district population. The amendment was not adopted.

(9) The third amendment (Senator D. Facemire Congressional #1) provided for three congressional districts of unequal population and comparatively less compact districts. Under this plan, the First Congressional District had a population of 618,100, the Second Congressional District had a population of 618,753 and the Third Congressional District 616,141. Thus, between the district with the highest population and the district with the lowest population there was a maximum population deviation of 2,612 persons (Absolute Overall Range). This calculates to a deviation of 0.42% (Relative Overall Range) from the ideal district population. The amendment was not adopted.

(10) The fourth amendment (Senator Barnes Congressional #1) provided for three congressional districts of unequal population and comparatively less compact districts. The First Congressional District had a population of 615,991, the Second Congressional District had a population of 620,862 and the Third Congressional District 616,141. Thus, between the district with the highest population and the district with the lowest population there was a maximum population deviation of 4,871 persons (Absolute Overall Range).

This calculates to a deviation of 0.79% (Relative Overall Range) from the ideal district population. This is the second highest deviation of all the plans considered by the Senate. The amendment was adopted.

(11) Pursuant to the fourth amendment as adopted (Senator Barnes Congressional #1), all of the counties comprising the three current congressional districts remain the same except that Mason County flops from the current Second Congressional District into the new Third Congressional District. Under the amendment, the new Second Congressional District is elongated (as opposed to compact as required by the West Virginia Constitution). Further, the quantitative measures of compactness indicate that the new Second Congressional District scores low in compactness, especially in comparison to the originating plan that was both compact and provided for three congressional districts of equal population.

(12) According to the written report of Kenneth C. Martis submitted to the committee, "[t]he current configuration of the West Virginia 2nd Congressional District is not in compliance with the 'compact' requirement of the West Virginia Constitution, Article I Section 1-4. The plan to remove Mason County from the 2nd District does not alter its current non compliance status." Further, the quantitative models of compactness show the low compactness calculations of the new Second Congressional District. (See the "Measures of Compactness" reports as submitted to the Select Committee on Redistricting and included in the committee records). The constitutional requirements of contiguous counties and compactness as enumerated in the West Virginia Constitution are measures to minimize political and racial gerrymandering.

(13) The committee reviewed historical maps as contained in the Kenneth C. Martis

report as well as the West Virginia Blue Books which demonstrate that the Second Congressional District historically has comprised eastern panhandle counties, mountain counties and some north central counties. It was not until the redistricting of 1991 that the Second Congressional District assumed an extreme elongated shape stretching from Jefferson County to the Ohio River. Pursuant to the fourth amendment as adopted (Senator Barnes Congressional #1), little is changed as the new Second Congressional District still stretches from Jefferson County across the width of the state to the Ohio River, making it one of the longest districts east of the Mississippi.

(14) In 1991 when West Virginia lost a congressional representative, the State Senate, led by the Senate President, gerrymandered the congressional districts by splitting the congressional district in the northeast region of the state among the three remaining congressional districts in order to give the other three incumbent congressmen the political advantage. At no time in the history of the state did the Eastern Panhandle region ever connect with the Kanawha Valley region in a congressional or other district. Other than being West Virginians, there are no other common interests or similarities between these two regions. The 1991 political gerrymandering has brought on the people of the Eastern Panhandle strong sentiments of underrepresentation and disenfranchisement. The continued malapportionment and the lack of compactness have kept this region from fully realizing the equal representation and equal protection enshrined in both the United States Constitution and West Virginia Constitution. Over the past two decades, this disproportionate representation was made even more disproportionate by continuing to overpopulate the second congressional district and maintaining disjointed regions in order to maintain political power and control in Charleston. It was evident from the debates and

discussions during this special session that it was the full intent of the Kanawha County delegation to keep the Eastern Panhandle region divided for political control. This was done by overpopulating even more the region (violating the United States Constitution's "one person, one vote" requirement) and preserving the chain of single contiguous counties (violating the West Virginia Constitution's compactness requirement) so its dominance in the second congressional district was maintained. This translates into the Eastern Panhandle region being underrepresented on various state boards, committees and commissions which are appointed according to congressional district.

(15) The principle evidence in support of the fourth amendment as adopted (Senator Barnes Congressional #1) was the general assertion that it kept intact the current districts thereby preserving the status of incumbent representatives to Congress. However, the burden is on the state to show with some specificity that a particular objective required the specific deviation in the plan, not just general assertions. Further, the showing required to justify the population deviations depends, in part, on the size of the deviation. (See *Karcher v. Daggett,* 462 U. S. 725 (1983)).

(16) On Friday, August 5, 2011, the committee reported an originating bill (SB 1008) comprising the county components of the fourth committee amendment as adopted (Senator Barnes Congressional #1). SB 1008 did not include any legislative findings regarding the plan's failure to achieve precise mathematical equality between and among the congressional districts or the Second Congressional District's lack of compactness. Meanwhile, this plan has a relative overall deviation of .79%, substantially greater than West Virginia's 1991 congressional plan's 0.09% variance reviewed by a federal court in *Stone v. Hechler* (782 F. Supp. 1116) or the 0.6984% variance of *Karcher.*

(17) During floor considerations on Friday, August 5, 2011, Senator Snyder offered a floor amendment to SB 1008. The floor amendment (Senator Snyder #1) provided for three congressional districts with populations substantially closer to mathematical equality and comprising more compact districts than SB 1008, while preserving the core of the current congressional districts. Under the Snyder #1 amendment plan, the First Congressional District had a population of 618,555, the Second Congressional District had a population of 618,298 and the Third Congressional District 616,141. Thus, between the district with the highest population and the district with the lowest population there was a maximum population deviation of 2,414 persons. This calculates to a deviation of 0.39% (Relative Overall Range) from the ideal congressional district population. The floor amendment was not adopted.

(18) On Friday, August 5, 2011, SB 1008 completed legislative action without further amendment to the congressional districts or the inclusion of any legislative findings articulating any substantive justification of the 0.79% population variance. Instead, proponents of SB 1008 expressed that they wanted to do the easy thing since they were tired and desirous of heading home or so that legislators and staff could attend an out-of-state conference beginning on Sunday, August 7, 2011.

(19) By comparison, most other states during the 2000 redistricting cycle, including West Virginia, had significantly less population deviation than SB 1008 (See attached NCSL "Redistricting 2000 Population Deviation Table"). From the information provided by NCSL and shared with all senators before the passage of SB 1008, already this year, other states have adopted plans with significantly less population deviation than West Virginia.

(20) While the trend in other states is heading to strict population equality, West

Virginia, during the last three redistricting cycles, has progressively increased from a deviation of 0.09% in 1991, to a population deviation of 0.22% in 2001 (the current congressional districts) and now to a population deviation of 0.79% in SB 1008.

In sum, other plans considered by the Senate Select Committee on Redistricting and the Legislature had lower population variances and were more compact. The population differences in SB 1008 were not the result of a good faith effort to achieve equality. The population differences could have been eliminated altogether or substantially reduced while at the same time meeting the state's constitutional requirement that districts be compact. However, the primary goal of the reapportionment of the congressional districts in SB 1008 was for the protection of the incumbents, with population and compactness (required constitutional components) being secondary considerations or not considered at all.

The Senate was aware of both the federal and state requirements and yet failed to adequately demonstrate that it kept the concepts of population equality and compactness as principal goals of its redistricting efforts. In fact, when Professor Robert Bastress, special counsel to the Senate Select Committee on Redistricting, was asked during the committee meeting whether the amendment offered by Senator Barnes was constitutional, counsel refused to opine an answer saying that he did not want his testimony used against him if this congressional plan was challenged in court. However, he did go on to say that unlike the relatively light burden imposed on the state to justify the 0.09% population difference in the 1991 court challenge (Stone v. Hechler), the burden on the state is correspondingly greater to justify the significant .79% deviation in SB 1008. SB 1008 has not met that burden. In fact, SB 1008 denies equal protection of the laws as guaranteed by

the United States Constitution to the citizens, taxpayers and qualified voters of West Virginia.

This injustice occurred in the 1991 redistricting with a Democratic legislature appeasing three of the four Democratic congressmen and a similar injustice continues in 2011. It is a geographical and regional issue where the principles of equal representation, equal protection and compactness were not upheld in SB 1008 in order to undermine a region of people. This congressional plan was not done in the best interest of the people, but instead it was done solely in the best interest of our elected congressional delegation (comprising one Democrat and two Republicans). I firmly believe that this injustice flies in the face of not only the principles our country was established on, but also the principle on which our state was founded nearly 150 years ago. Where the Legislature has failed to right this wrong, I hope the courts will address this injustice.

For these reasons, among others, I cannot support SB 1008 as it does not meet the requirements of the United States or West Virginia constitutions.