REMARKS OF

**HONORABLE**

**HERB SNYDER**

_____

*Thursday, August 4, 2011*

SENATOR SNYDER:    I think today is a good day now that the Redistricting committee has finished its work on the congressional bill.  As most of you know, I've been quite interested in it for some period of time, actually a year, and I've put in a lot of effort.   Hopefully, I've acted in a very professional manner through all of that.

But I want to make it clear to the body what my major intent there was.  I talked with the Minority Leader and assured him and other minority members that my intent was never partisan, never partisan.  I think I'm not a real partisan person.  I learned that at home.  My father was a Republican and my mother was a Democrat. I guess I never wanted to get into the middle of that, Mr. President.  It's a pretty good nature.  Maybe I ought to go to D. C.  They need a little bit of that.

But I want to be perfectly clear that my motives were for the eastern part of the state, my home, not just Jefferson County, not just Berkeley County and Morgan County--I used to have all three counties--but the entire eastern part of the state.  On the other side of the mountains, starting into the Shenandoah Valley, it's a

1



**EXHIBIT**

B

different, beautiful part of the state.  We're quite blessed in many respects to have the growth that we have over there.  It's a lot.  I wish, I deeply wish, I could share that growth with every one of the counties that have lost growth.

I took no glee whatsoever in seeing the decisions, the painful decisions, that the members had to make here that lost population. I took no satisfaction at all in that.  My Senate district grew by 36,000 people.  That's a lot, Mr. President.  That was 85 percent of the growth that West Virginia sustained over 10 years.  Eighty-five percent was in my Senate district and it will continue.

I want to be perfectly clear that my interests and my involvement in this congressional redistricting was to do what I could for the economy of the eastern part of the state.  Not just my district, but the entire eastern part of the state.

Now, although we've almost finished congressional redistricting for another ten years, my efforts will not cease, Mr. President.

I love West Virginia.  I feel it's an incumbent responsibility for me to represent and do what I can and do what I feel is right for the eastern part of the state.  What I attempted to do, I truly in my heart felt, was the right thing to do:  To start patching back together what happened in 1991.  It probably generated some hard feelings.  That was tough, too.  That was, maybe, one of the toughest redistricting issues in many, many decades when we were

2

losing a congressman.  That's tough.  It may not be personal for anyone in this body but it's still tough because you have to make those decisions to decide which congressman is going to go--who's going to get to file in the district.

I hope that through all this I have acted professionally and put forth what many of you thought was a really good map but just couldn't support it--and that's fine.  The Senator from Randolph-- he said it in the committee today--he commended me for the work that I had done.  I appreciate that, Senator, very much.

But, again, it's another day.  We've got a lot of work to do and I'll continue to advocate.  I just wanted to go on the record today that, Mr. President, that it's an honor to serve in this body and an honor to be a senator from the great eastern part of the great State of West Virginia.

Thank you, Mr. President.

3

**Reapportioning congressional districts**

*(Adoption of Senator Snyder's amendment*

*to Senate Bill No. 1008)*

---

REMARKS OF

**HONORABLE**

**HERB SNYDER**

---

*Friday, August 5, 2011*

SENATOR SNYDER: What you have before you and I believe you all have been furnished, we're dragging here today at 5:30 so everyone has had all afternoon to take a look at this.   I believe you're familiar with it.

What passed out of the Senate Redistricting committee was what's commonly referred to as the "Mason County Only Plan".   I won't disparage it by calling it the "Flop Plan" just switching Mason County into the current district so that we keep the current district.

In addition, as you all know, I presented a plan that had a variance that totally reconfigured and changed cores of congressional districts.   I listened to all of that debate in committee.  And I appreciate the work of the committee but they did not accept it.   Fine.

But what this amendment does is move three counties in the

1

Eastern Panhandle and puts them in to make the panhandle whole. That was my goal--to make the Eastern Panhandle whole. And in doing that, by moving roughly 47,000 or 48,000 people, they had to then go over and take some people off the other end of the district. My intention was to fill in the panhandle and to make the panhandle whole for regional issues and regional representation. Where would I pick up population to put in the First when you take Mineral County, Grant County and Tucker County and put it in to make the panhandle whole?

You all have the map on your desk. I had to go clear down to the end of the district. Some call it the "tapeworm" of cobbled together counties that end up down at Kanawha with the counties above it. You couldn't stop anywhere else because they're single counties end to end. I had no other choice if I was going to make the panhandle whole but to take it from the other end of the district. The district, by the way, that still, probably, is one of the longest congressional districts this side of the Mississippi River. One has to ask: Is that necessary?

What this amendment does is to take, to put back in the Second, enough citizens of West Virginia in those counties to be within the variance. We've lowered the variance and I've moved Jackson County, Roane County and Wirt County into the First District to make up for the loss.

Lo and behold, in an attempt to do that to see if there was

2

some other way to do it after listening in the committee today, the numbers came out with a lower deviation than any amendment in the Senate Redistricting committee.

It has a lower variance than the .79 plan that is the bill before us, the "Mason County Switch Only Plan". Mine is versus .79. This has a .39 percent variance--that is half. We have the opportunity here to vote for a lower variance that is half the variance of the .79. That's important, Mr. President.

The federal courts have said that's important. This is done with modern computer technology these days. We're not doing this by hand any more or hand calculated; it has to be calculated. This is all done by sophisticated redistricting software. The amendment before you is .39 versus .79. One should consider that.

But what have you done geographically? Have you changed the cores of the district that was heavily debated yesterday? No. The cores of the districts remain the same. Have you moved one of the sitting congressmen into another district? No. All of those things were important yesterday and I can appreciate those things.

Is it more compact? We talked about compactness. I would say that it certainly makes the Eastern Panhandle compact. The current district that is before you, without this amendment, the Eastern Panhandle is split. The Eastern Panhandle, the neck of the horse head in the Eastern Panhandle is split in half between two congressional districts--the First and the Second running up the

3

length of the panhandle.

Well, certainly, my plan, the amendment before you, makes the Eastern Panhandle compact. It makes it whole. That was my goal--lo and behold at a lower variance. What's it do for the First to come down the Mason-Dixon line, the north-south line, a nice square line in the State of West Virginia comes down into the Eastern Panhandle and branches off.

Suddenly, you don't have that hook that was arbitrarily created by the legislative body in 1991. It's a nice hook but it's not necessary. And I would say it disenfranchises the citizens of Mineral and Grant counties to separate them from Hampshire and Hardy. So it does that. It makes that geographic configuration of the First District better and, certainly, more compact without that hook. If we have the opportunity to eliminate a hook like that in congressional districts we should.

Our state, Mr. President, has two unique features that everyone sees on refrigerator magnets and our state maps and every place. It's unique. The Northern Panhandle and the Eastern Panhandle make our state a unique shape. That's how we were created. That's who we are.

Now, it was the committee's desire to put out the map that is the bill before us now. I'm asking to make some positive changes that do not change the congressional cores, do not make any of the congressmen run against each other. But it still fills in the

Eastern Panhandle by moving those three counties into the Second and three counties into the First and out of the Second. And, that is, lo and behold, a .39 versus .79 percent variance--range of variance. This is range of variance by percentage. The highest positive number added with the lowest positive number .39. That's pretty low.

This map also keeps counties whole. Now that's not a mandate by our Constitution, although compactness is. Article I, Section 4 of our West Virginia Constitution says that they shall be contiguous, the counties shall be contiguous, and be compact.

The federal standard for compactness is just one of the factors. And, I will tell you that a controlling factor here in the State of West Virginia is compactness. It is one of the primary standards.

Federal law has driven us on variation. That's well settled and becoming more precise every day. And 15 states now have it in their state election laws. It has to be zero or as close to as possible. Some states have a deviation of one person. But we're moving toward that.

And, I agree with the committee. They did not want to split counties and that clearly is the objective of this Senate in working with that. And I agree with that and I have done that. It is a very long-standing tradition of not splitting counties. So you know when you are in a county who your congressman is. I have

5

upheld that. Someday, we may have to go to a zero standard but not this year.

You have before you, in my amendment, the opportunity to take the Eastern Panhandle and make it whole.   That is my objective. This map has a lower range of variation and I will tell you it not only makes the Second District more compact but it also makes the First District more compact.

Thank you, Mr. President.   And, I ask for the opportunity to close.

———  —

SENATOR SNYDER:  Mr. President, thank you.   For the record, I deny that this is partisan.   I have given you, and they are clear on their face when you look at this map, this is putting the Eastern Panhandle back together.   It does, to my understanding, very slightly, less than one percent, change the historic vote. That was not my goal and, quite frankly, I wish it didn't.   Because that's not my goal here.

Some of the other senators, the Senior from the Seventeenth, mentioned he admires my passion for the Eastern Panhandle.   Thank you, Senator.   But my passion is surpassed by that today.   My passion to get this right.   Let's get this right.   You have a lower deviation with a perfection amendment to the bill that's before us. This is a perfection amendment.   Each in his own mind has to ask why we would like that or not like that.   But the controlling

6

factor is we're getting closer to zero variation.  I was actually surprised when I generated this map last night that it was that close.  I thought it would be so far off you would have never seen this map today because I worked on Snyder 1 and Snyder 1B.  I was very open.  I sent congressional maps to all the Redistricting committee members.  Snyder 1, you might remember, where Randolph County went into the Third District and not Mason.  And when a few people got it, they said try that switch of Mason County.  I did.  And, lo and behold, the variance was lower.  So I immediately changed the map because it is a better map.  So, then I concentrated on getting support for what I thought was a superior map.  The Redistricting committee, Mr. President, rejected that idea.  I can appreciate that.  The reason this district is still cobbled together end-to-end counties, close to 400 miles long--I think we shortened it a little; it won't seem like much less of a drive if you are driving from the Eastern Panhandle--but at the same time it is a perfection amendment.  And certainly, I believe, everyone saw Map 1B because I sent out letters that were delivered to your offices, to every single member of the Legislature, and the Governor's Office.  Here is Snyder 1B.  It had the counties all attached, the data, the variance all calculated.  While we're thinking about what we're doing, I wanted to get it out there.  I hadn't seen any other proposals.  In fact, I had never seen even the printed map for the one that is the bill before us from the

committee until I went to the Redistricting committee meeting. In fact, I took one for comparison. I hadn't seen anyone create that yet.

So, the comment that suddenly here you're having this land on your desk and you've got to consider it does not hold. I want to point out that in the Redistricting committee, that meeting lasted approximately an hour. I'm not on that committee for the record. I appeared before it and spoke in support of my plan that I brought forward. There were four amendments. Four amendments and the originating bill. No one had seen the originating bill. I don't know that anyone other than a few members that did the maps saw any of those four other than mine. The whole committee had gotten it a good week before and then every member of the Legislature got it that day, of course, and I mailed that letter with 1B so everyone would know what they were voting on. The map that was adopted won out. There were several amendments offered by the Senator from Marion. All in one hour.

The order that the Chairman took them in was to vote on two offered by the Senator from Marion, then one from Snyder, Snyder 1B--these are all amendments--then the final Mason County only amendment. That's what's before you today in the bill. One hour. For the record we've had this floor amendment; you've seen this. It was filed earlier this morning. You've had seven hours. Seven hours! Versus one hour to look at four plans. No, five plans!

8

I'm sorry, five plans.  You've got to include the originating bill.
So, the argument that we don't have time to look at this does not
hold.

I think what's probably controlling this debate, and I'll use
the comments of why not adopt this amendment.  It's important.
When you've got the Karcher case at 0.64 percent that the federal
court said:  Not close enough.  And they rejected the state's plan.
Perfection is important.  Deviations are important.  I am a
chemist.  I understand it; it's important.  And that's what we are
doing here today.  You have a .79 percent deviation in the bill.
The amendment is .39.  We've talked about the map that was adopted
in 1991 that is embodied in this long district with the
congressional cores and so forth.  It preserves the last 20 years
of history and everyone's seat.  I certainly am not proposing that
configuration; that's what the committee came out with.  There
seemed to be an overwhelming will to keep that configuration in one
form or another.  I'm simply trying to perfect it.  Some would say
it's inconvenient to move one county.  We talked to them.  Well, we
don't have any choice; it's got to be one county.  But that's not
the standard.  The standard is perfection, to get this as low as we
can.  Is it inconvenient to move seven counties and cut the
deviation in half and still maintain the cores of communities of
interest to get that variation lower?  I think deviation matters.
I think it very much matters.

9

But, in addition, the Minority Leader stated, and I realize as he said, "It's late in the game." "We've been here for five days; everyone wants to go home. Hopefully, tonight." You don't have to go home tonight. We could come back on the 15th; we could come back in September if we wanted to do this. So, is the controlling factor that it's late in the game, the last hour? If we pass this, the Minority Leader said, "we'll be here for a while", quote, unquote.

I don't think that's a controlling factor. I think perfection is the controlling factor. Again, in 1991 (often compared in committee and compared here) the deviation on that '91 map was 0.09. It was litigated right away in court and the courts upheld it with that low deviation. But, again, the choice is clear on its face, what we're doing. My intent was to put the Eastern Panhandle back together, work within the bill, the map that we have that came from committee, and that's what I have attempted to do. But my goal was perfection.

I ask for your support of the amendment, Mr. President.

Thank you.

---

**Reapportioning congressional districts**

*(Adoption of Senator Snyder's amendment*

*to Senate Bill No. 1008)*

REMARKS OF

**HONORABLE**

**MIKE HALL**

*Friday, August 5, 2011*

SENATOR HALL:   Mr. President, just briefly, two or three responding comments.   First of all, I absolutely commend the Senator from Jefferson for all of his passion and work on this particular issue.

I also wanted to speak positively about the process that we have proceeded with in the Senate when it came to our particular redistricting issues.   You held task force meetings around the state.   I happened to be on that task force and was not able to attend all of those meetings but did get to attend some of them.

One of them, Mr. President, was up in your area.   As we went in to listen to the conversation about redistricting, we heard a whole lot about this congressional race.   And, as I have had pointed out to me, in that particular meeting there were numerous people there who said we want to do this Mason County flip.

The public was aware of the issue at hand.   And, I even made

1

the comment, I've been reminded that, as a representative of Mason County, that simply moving them to fix the problem without consulting with them may be offensive to them. And I have checked with the leadership over there and, you know, they're really not that happy about losing their current congresswoman but at the same time they understand what's going on. I haven't had a lot of push back.

As a matter of fact, most of my e-mails have been for that particular change. Notwithstanding some of the points that have been made by the Senator from Jefferson, this plan that we have before us did come out by a unanimous voice vote, I believe, out of the committee. There is a difference in variance which we could fix by an amendment--there are two amendments but they would divide counties--but we could fix the variance issue like the perfect plan did. We could do that.

But it does have a higher variance. I listened to Professor Bastress' explanation the other day that one percent threshold is the point of danger. The court battles in the past, the one that was brought to the court in Pennsylvania, I believe because of a .6, was really over a municipal issue. It would be nice to have this plan before the committee, to have him comment, but we're not at that point. We're here today. But I don't think this plan would be successfully challenged.

I would just like to further expand on the fact of the

2

openness of this process.   At the Wheeling hearing and other places, a lot of the public out there believed that we had settled this question.   I don't compute anybody's motives, its just the nature of our process from our perspective, but from the public's perspective, you know, this comes up.   It's been known about for four or five hours.   I understand there's probably been a lot of discussion among the members today as to whether to vote for it or not.   So it's kind of late to the game.   And I would not want it to seem that suddenly something happened at the last hour.   I believe the public had settled, at least the public talking to me on where we were.   And that's one of the main reasons I do believe that the plan that's before us, unamended, would withstand the court challenge.   There may be, as obviously has been pointed out in the numbers, a difference in variance which could be fixed.

But I would encourage the members to stay where we are.   We've heard from the public on this.   If we pass this amendment, we're probably going to be here a few days more to get it through the process.   I don't know where it would be in the House.   We'll probably have to be another 24 hours here to get input to the senators on this plan.   But generally I would say that the citizenry that has communicated to me who are affected in these districts are satisfied with what we have done already.

I think we should just proceed forward, defeat this amendment and send it over to our fellow legislators in the House.   The

version that we have up there, the product of an open process, the
product of the committee work and two or three hours of hearings.
And I commend the Majority Leader for his work on this.   It's
probably been the most open in the history of the state.   And we
have that product up there; and, I think we ought to stick with it.
So, those would be my comments.   And I would ask you to reject the
Senator's amendment.

4

**Reapportioning congressional districts**

*(Adoption of Senator Snyder's amendment*

*to Senate Bill No. 1008)*

REMARKS OF

**HONORABLE**

**BROOKS F. MCCABE, JR.**

*Friday, August 5, 2011*

SENATOR MCCABE: Mr. President, I was not going to comment on this amendment, but there have been a number of discussions today about the key role that Kanawha County plays and how we should look at the redistricting. I want to assure the Senate that Senators from the Eighth and Seventeenth Districts have paid a lot of attention. I have really unqualified respect for the Senator from Jefferson. I absolutely understand his motivation, why he is proposing the amendment and I believe in my heart that he is doing good work--especially for the members of his district.

I would like to make a few comments so the Senate, as a whole, can have a better understanding of why we in the Eighth and Seventeenth Districts here in Kanawha County are hesitant to go with this amendment. Or, at least, I personally am. We're talking about moving 47,000 to 52,000 people from one district to another. The 52,000 people that are in Jackson and Roane, particularly, and

1

Wirt are important to Kanawha County. We, in my home county, need
to look at that. We understand the importance of creating a
unified Eastern Panhandle; we also understand the importance of a
unified economy around which our district operates. And Jackson
County, Putnam County and Roane County are key to how we, as an
economy, operate. We are talking about moving Jackson and Roane
counties as well as Wirt to the district to the north of us, to the
First District and acquiring three other counties in the bottom of
the Eastern Panhandle in the Second District. That has an effect
on how we view the world, how our economy and how our counties
interact immediately around us. I would like to just suggest that
is one of the concerns that we have.

We are looking at the plan that was approved yesterday and is
before us and here trying to be amended. The plan that was
approved yesterday requires one county to be moved from one
congressional district to another. This particular amendment
requires seven counties to be moved from one district to another.
We have heard that this is like a long string, this unbelievably
long district. As best I can tell, the amendment before us in no
way affects the length of the district. It still runs from Putnam
County all the way up to Jefferson County. So, we still have a
long district. In fact, the action that was taken yesterday by
moving Mason County reduced the length of the district.

In summary, I have to thank the Acting Senate President for

2

allowing us several hours this afternoon to visit with some of our constituents to find out better how those of us in Kanawha County might look at this.  It gave us a clear opportunity to examine the proposed amendment.  We availed ourselves to talk to some people within the county.  Without exception, it is being suggested to us that the amendment before us probably should not have our support even though we understand it is extremely important to the Senator from Jefferson.  We understand his issues; we understand what he is trying to accomplish.  We applaud him for his action and his diligence.  But as we look at the big picture, the amendment does not work with moving seven counties between districts and having a significant population shift from our immediate economic area to another part of the state that is more distant and less interactive with us.  We in Kanawha County, or more correctly, myself as a Senior Senator from the Seventeenth will not be able to support the amendment.

Thank you, Mr. President.

—— ——

3

**Reapportioning congressional districts**

*(Adoption of Senator Snyder's amendment*

*to Senate Bill No. 1008)*

———————

REMARKS OF

**HONORABLE**

**KAREN L. FACEMYER**

———————

*Friday, August 5, 2011*

SENATOR K. FACEMYER:  Thank you, Mr. President.

I rise in opposition to the amendment.  And I do commend the gentleman from Jefferson for his passion for his district--no different than me standing here right now for the passion for my district--Jackson and Mason counties, Roane County.  You know, when we first started this discussion and we were talking about flipping Mason County, I said, "No.  I really don't want that."  But when you got down to the brass tacks of it, it made the most sense.  It was the easiest switch that we could have done, so I stepped back and said, "That's for the best of the state.  That's for the best of what we are doing here."  But then to come in this morning and have this thrown before us, it kind of took me back.

Jackson County and Roane County like their Congresswoman.  Like the person it is.  So, with some of the arguments I heard this morning, and even a couple that were made by the Senator from

1

Jefferson earlier, I just have to wonder:  The past maps from 1991
when supposedly the district in the Eastern Panhandle was split
apart somewhat, that was three Democratic congressman that got that
done--to help them oust the Republican congressman from the Eastern
Panhandle.

Well, that stood true through this past year and now we have
two Republican congressman.  So, I have to wonder how much
partisanship is playing into it.  You know, these Republicans were
elected from something that the Democrats controlled.  Democrats
controlled the Senate when they did it back in '91--it wasn't
Republicans--they gerrymandered and got people out.

Now, I hope most of you all know, maybe some of the new ones
don't; but I have been one of the least partisan people on this
floor most anytime in the last ten years, eleven years now.  I have
voted with the other side probably more than I have my side.  So,
I am not coming at this from a partisan viewpoint.  And I'm hoping
that you all wouldn't either, but it's kind of starting to flap in
our face that it is.

How can you have the argument of compacting an area in the
Eastern Panhandle together when it pretty much is--there's a couple
counties that will make the switch--and tear up the western side of
the state.  And we talk about growth in the Eastern Panhandle and
that's all well and good--and that's for the good of the state.
But you're tearing apart another growth area of the state.  Mason,

2

Jackson and Roane counties all grew this last census. Maybe not by as much as the Eastern Panhandle, but they grew. And they need to stay together. And they need to stay in with the delegation that is there now. Some of the conversations that went offside of this floor were: We need the population up here; we need to shift this so that the Eastern Panhandle has more voice in Charleston. We need to equal the votes and stuff coming out of Charleston.

And I know there has been a cry from many people along the way, because of boards and commissions that are appointed by the congressional districts. People in the second congressional district, from the Eastern Panhandle to the Ohio River, tend to come out of the Kanawha County area. Well, there's a simple solution. You know, if somebody wants to serve on a board or a commission, all they have to do is say they will and nine chances out of ten their representative--whether it be in the House of Delegates or the Senate--can speak to the Governor and make sure that gets done.

I know I go often and say I've got this person that's interested in this board or this commission. I know many of you do that too. So, we can handle that. One of the reasons that they come out of Kanawha County is this is the seat of our state government. Sometimes we don't like that when we hear that, you know, offices can't be built in Putnam County or other counties because of the court ruling. But it is because this is the seat of

3

our state government.  So, therefore, a lot of the people on these boards and commissions come from this area because they will show up.  And a lot of these boards and commissions--I don't know how many of you all sit on different boards and stuff--but it's really hard to get a quorum to show up for meetings.  And, so, you get that by having people close by that will be there when the meetings are held.  So, I don't think that is a valid argument.

But I do resent the fact that it seems like we have gone, even though it has not been said on this floor other than by myself--and leave it to me to try to show all the brass tacks here--but it is extremely partisan.  And I would hope, because myself being a Republican, and I somewhat jokingly but sincerely mean it:  You guys are making me even more Republican every day when I am trying to do what is right here--that we step back and look and do what is right here.

Jackson County, Roane County and, I would assume--I don't represent Wirt so I haven't had contact with them--but I would assume they like the district they're in.

But the other problem we have here, as we sit here, and whether it be the Senate map, or on the House side the House map and now this congressional map, we're trying to gerrymander it out to help certain senators or help certain Congress people or people wanting to run for Congress that have been down here lobbying all week.  We're trying to help them out and the problem is not here.

4

The problem is you need to get your people out to vote.  How can we sit back and allow 13 or 17 percent of the people determine who sits in these seats, who sits in the Governor's seat.   That's the problem.   But all we're doing is aggravating it and making people understand that they want nothing to do with us.  People don't want to vote because of what we are doing right here.   And that's carving up districts that don't want to be carved up.

With that, Mr. President, I would ask people to reject the amendment.   Thank you.

———  —

5